May it please the Court, I'm Hillary Allred, appearing for the petitioner, Marjorie LeLong. This case is materially indistinguishable from SAIL. Like the petitioner in SAIL, Ms. LeLong is a young ethnic Chinese Christian woman from Indonesia who is granted asylum in a thoughtful decision by immigration judge Miriam Hayward in San Francisco, only to lose her grant of asylum in a split decision by the board. In SAIL, this Court recognized and examined in great detail the century-long yet cyclical violence that the general population in Indonesia, which is predominantly Muslim, has perpetrated against the ethnic Chinese minority. This Court also recognized that when a group of people is significantly disfavored, as are the ethnic Chinese in Indonesia, an asylum applicant need only demonstrate a comparatively low level of individualized risk to prove her well-founded fear of future persecution. The immigration judge found that Ms. LeLong was credible, and the board did not question that finding. The evidence in this record compels the conclusion that Ms. LeLong has met her burden in showing that she individually is at risk. Here is the evidence. First, in the 1960s, during what was really a pogrom against the ethnic Chinese, where tens of thousands of ethnic Chinese were killed, Ms. LeLong's father was detained at least twice by the Indonesian military. On one occasion, he was detained for over two weeks. He was beaten and he was not given food. This is AR-245 and 243-244. Second, after Ms. LeLong arrived in the United States, she came to the United States in 1990 as a student. After her arrival and after the May – actually, during the May 1998 riots, she heard that two of her high school friends were attacked by Indonesian Muslim youth. They were pulled out of their car. One of them escaped. The other one was raped at ninth point. She tried to – she complained to the police. The police did not help her. Her friend tried to commit suicide afterwards. Third, her uncle, also after the riots, while he was jogging in the early morning in Jakarta in a predominantly Chinese neighborhood, was attacked by Indonesian – ethnic Indonesian youths. He was robbed and he was beaten so severely that his face required surgery. Fourth, the home of her – of one of her cousins that lived close to her family was burglarized. Everything was taken and the family was simply glad that they weren't there because they could have been raped or murdered. Fifth, also after the 1998 riots and while Ms. LeLong was in the United States, her family church was threatened. They received a bomb threat. Her – the record states that her parents go much less frequently to church. Her mother never goes alone and they always lock their doors and windows when they go. Sixth, Ms. LeLong's mother in September of 2000, around the time of her hearing, saw hundreds of Muslim demonstrators wearing white near their church, waving flags, and saying that they were intent on killing Christians. This is AR-311. Seventh, as a young girl, Ms. LeLong was never allowed to go anywhere in Jakarta unaccompanied by either her family or by friends. Eighth, despite these precautions, frequently on the streets of Jakarta, there was a woman who, on her way to school, ethnic Indonesians insulted her. They touched her. They pulled her shirt. They called her amoy, which is a derogatory word for Chinese woman. They called her slanted eyes. She feared that if she were not accompanied by the boys from her school, that they would do much worse. Ninth, her family lived generally isolated, although they lived – when she was there, they lived in a mixed neighborhood. They lived generally isolated from ethnic Indonesians and associated only with other ethnic Chinese. When it – tenth, when it came time for her to go to university, she knew that because of the informal quotas that limit the number of ethnic Chinese students, she was sure that she wouldn't be admitted into a university. What the quotas do is they either limit the number of the students or they impose very large costs on Chinese students. So she, like her two brothers, went to study abroad, and that's why she came to the United States. And finally, as far back as her grandparents, in order to hide their recent immigration from China, Ms. LeLong's grandparents burned their birth certificates. Well, Mr. Arnold, you know, it's clear that the ethnic Chinese have had a hard time in Indonesia. But you recite these incidents, and it's very hard to see where there was severe persecution of your client. Well, she doesn't claim that, and it's not appealing that. It's purely a well-founded fear case, but I guess to follow up on Judge Noonan's question, does that mean that every ethnic Chinese Christian who comes to the United States is entitled to asylum, under your logic? On this record, Ms. LeLong's expert, in fact, says that when specifically addressing the level of risk for her as a young ethnic Chinese woman in her age group, if you're talking – I would say no, not every ethnic Chinese, but certainly every young ethnic Chinese woman, I would say yes on this record. But the Court doesn't have to reach that conclusion. No. I think the question is, is there something different that's individualized about her well-founded fear in this case? Yes, Your Honor. And that's why I specifically focused on – I do concede that. Yes. So she's relying now on this evidence of – to justify objectively her well-founded fear of individualized future persecution. That's correct, Your Honor. So how does a string of really bad incidents, how does it add up to evidence that would support a fear of future persecution? Well, in Sale, like Ms. LeLong, the immigration judge found that she had not established past persecution. In fact, in Sale, I might have – I would have argued that she had. But in this – what Sale made clear was that the level of individualized risk needs to be comparatively low. And so I think – Well, where is the individualized risk is what we're asking. You say really any Chinese woman from Indonesia would be in her shoes. It's not individualized. During the entire time that Ms. LeLong lived in Indonesia, she was – she credibly testified that she was the focus of constant attention by ethnic Indonesians. She was very unpleasant. There's no doubt about it. But, Your Honor, it doesn't have to rise to the level of persecution. It just has to show that she individually is at risk. Risk of what, though? Of being raped, of being attacked, of being – during one of the periods of cyclical violence, when the economy goes down in Indonesia and rioting begins, she's at risk of being targeted. Do you want to save the rest of your time for rebuttal?    May it please the Court. I'm Lyle Jensen. I represent the Respondent today at the Department, John Ashcroft. Excuse me. Although Ms. LeLong may have shown that ethnic Chinese Christians in Indonesia  is generally not available to victims of civil strife unless they are singled out on account of a protected ground, Ms. LeLong has not suffered anything more than minor harassment. She conceded at her hearing before the immigration judge that she did not suffer past persecution, and that is what the immigration judge found. And that finding is clearly supported by substantial evidence in the record in that Ms. LeLong. It's not even challenged. That's correct. So we're just operating without the presumption. There is no presumption at all. Ms. LeLong was in the United States during all this time. Contrary to what my opponent has said, Ms. LeLong has shown no nexus between Chinese Christian ethnics and herself, that she is in any more risk than anyone else in China. When she was a child, people made – they called her names on occasion. Sometimes they tugged on her shirt sleeve or touched her arm. The incident that referred to her father happened before she was ever born. Her father, that was 1967, 35, 37 years ago. It has not been repeated. Her father is gainfully employed. Her mother, her father, and her brother and most of her extended family still remain in Indonesia, in Jakarta, and they have not been subject to any harm. This case is very much different than Sale in that Sale herself was the focus of individual harm. The house that Sale was staying at, the boarding house, was stoned. Sale was in a taxi cab that a crowd rushed, and it was only by the grace of God that she was not pulled out of that taxi cab. When Sale took her child to the doctor to be immunized, her neighbors rushed on the car, broke off a rearview mirror and I think a window wiper, a windshield wiper, and made threats to her. None of this has ever occurred in this case. We have a young woman who is simply saying, I am an ethnic Christian Chinese, I am from Indonesia, therefore I am entitled to asylum. That's not what the Sale case states, and she should not be granted asylum on those facts. She simply has not shown any kind of a nexus between the disfavored group, the ethnic Chinese, and an increased risk to herself. She's shown no increased risk to herself whatsoever. How do you deal with the I.J.'s specific findings to the contrary? The I.J. found – well, the I.J., as I said, did not find any past persecution. Yes. No, we're way beyond that. The I.J. says the court does not find – the I.J. finds respondents fear of persecution credible on an objective and a subjective basis. And it goes on to talk about the indications that the President's power in Indonesia is sufficiently weakened at the time, ability to protect physical attacks is compromised. It goes down the line and then concludes viewing the record as a whole, the court cannot find respondents' fear of ethnic and religiously based persecution are unreasonable as a matter of law. It goes on. Certainly there is subjective fear. I think the I.J. and the BIA, of course, had to agree with that, and they did. Right. The question is, is there an objective fear? Now, the I.J. seemed to be going on a pattern and pattern, pattern of harassment. But she did find that that's all there was, was harassment. The point is, to go with what the I.J. said would, in fact, do what this Court asked about, wouldn't that entitle every ethnic Chinese woman to come into the United States? There's no doubt, and we can't contradict the record, the government doesn't try, that there has been periodic cyclical violence against the ethnic Chinese. But if we're talking that of a population of something like 8 or 10 million during the 1998 riots, which seemed to be the focus of that's why she filed for asylum, approximately 66, 67 women claimed they were raped. And that's a horrible, horrible thing. There's no doubt about that. But she hasn't shown that she is in that category that she would be subject to rape. Clearly, if only 67 out of a very large population were, many were not harmed. And her family, according to her testimony in the 1998 riots, suffered no harm. The I.J. says the Court credits Respondent's testimony that her parents currently fear undertaking such simple expressions of their religious beliefs as attending church out of fear of violence. And that constitutes harassment. There's no doubt. And that constitutes possibly discrimination. But that's a little bit different than persecution. Persecution is a much more extreme concept. Well, it says fear of violence. It doesn't talk about discrimination. That's persecution, right? But that's a fear of violence only if it's real. There's no indication that church has ever been attacked. No, the question is whether it's a well-founded fear. And the I.J. credited her testimony that her parents feared taking such simple expressions of religious belief as attending church out of fear of violence. So the I.J. certainly did find that. And, of course, the BIA reversed that. Again, we would argue that that's not extreme enough to constitute the type of persecution that would entitle her to asylum. Because if that were the case, if all – if we're saying that Chinese Christians in Indonesia were all at risk, then all of them are entitled to asylum. And that's basically we're saying because of periodic civil strife. No, I think what the I.J. was saying is we take the general and the evidence and the record about what's happening generally in Indonesia, and then she found that there was enough of a nexus with this family to reach her conclusion. That's the way I took it.  Going to church. The testimony also was that the mother does go to church with the father and that the mother, if the whole family goes together, she feels safe. She does not want to go alone. Again, the BIA took a step back from that and found that that was not a well-founded fear of persecution sufficient to entitle Ms. LeLong, who's been in the United States, to asylum. And we would argue that that – the record does not compel a conclusion contrary to the Board of Immigration Appeals. Because the Board of Immigration Appeals did its own review, this Court actually only reviews, as the Court I'm sure knows and does know, the BIA's decision. And the BIA's opinion is cogent. I mean, there's no doubt under sales the government's burden is a little bit harder. We understand that. But in sales, different than this case, that particular woman showed that she was in some ways a target. This woman has not. This woman's father, although she says, I think sales say – I'm sorry. I apologize. I believe that Ms. LeLong said her father was the subject of economic discrimination. In point of fact, he has a job with a – I think a timber company. The family is doing all right. The family has remained there. Subsequent to the 2000 – to the 1998 riots, the mother has left Indonesia, gone to Singapore to visit, and come back to Indonesia. Counsel, let me ask this. Under the regulations, if you establish that there is a pattern and practice and that you are a member of the group which is suffering both persecution and discrimination, do you have to show that you are particularly a single daughter? The burden is much less in that case, Your Honor. I think we've got a pattern and practice here. Well, then that would be a pattern and practice, then, for all Indonesian Chinese. Well, that could be. And if that's the case, then what – you know, the logical conclusion is all Indonesian – I think Chinese Christians are entitled to asylum. No, there's just that the standard is lessened for them as a group. But in this case where there's been no harm to this particular woman whatsoever, that's lowering the bar very low. Counsel, what does the regulation say when you establish pattern and practice and that you are a member of that group? Do you have to show anything else under that regulation? Well, you have to show that you're a member of the group. We agree with that. Yes. But here, and my understanding of Your Honor's opinion in Sale was not that she found a pattern and practice. We did not find a pattern and practice in that case simply because of the nature of the evidence that was put in. Now, in this case, is there evidence of pattern and practice? There is not. There's evidence of cyclical violence, which is the exact same as in the Sale decision. As a matter of fact, if you take a look at the beginning of the Petitioner's brief, they almost cite the same things going back to the Dutch. Yes, the Chinese are very well-to-do in Indonesia. They've had their problems on occasion. Nothing recently. It's been not government-sponsored extremism. You know, we're going to go after these people. We're going to do nothing. The government may not have been able to protect some of the Chinese as well as it could have been, but the fact that the Chinese were able to do so is a fact. It goes beyond that, Counsel. Whether or not they're able, they don't care to protect. I don't know. I would not read the record that way, Your Honor. Certainly the Prime Minister eased many of the discriminatory laws against the Chinese, many of the ñ and he appointed Chinese to very high-level positions in the economic ñ in the government in economic spheres. Many of the Chinese have come back. They've been urging themselves to come back. All of this is in the record, and it's in the brief, to bring back their wealth. Chinese holidays, Chinese writing, it was now all ñ whereas at one time the government clamped down on it, they've eased up on it. I don't know there would be a fair characterization to say the government's not concerned. Certainly in some cases, when there's a very large riot, the government has not been able to protect. I don't think that we're contesting that. But it doesn't come to the extreme level of a pattern in practice where the government is focusing on this, where it keeps happening and the government doesn't do anything. The government has tried to do something. They've passed regulations. The country reports indicate that. Yes, it's still quite ñ I'd like to apologize to the Court. I'm at the end of my time. I did not mean to run over. The point is, though, the government ñ this isn't the same type of thing as we had in Russia with the pogroms, where the government instigated the peasants to go after the Jewish community. This is a little bit different. In Russia, they weren't even trying to protect the Jewish community. They were encouraging it. Here, they've been trying to protect, they've been trying to ease laws rather than restrict laws on the community. Sometimes it's been successful, sometimes not. But clearly, we haven't had the type of riots that we've had since 1998. And the fact that the Petitioner's family does feel safe is indicative by the fact that her brother came back from Australia from studying, and her mother, who went on a trip to Singapore in 2000, felt safe enough to come back to Indonesia. That would go more towards your disfavored group than your pattern in practice. I am over my time, and I apologize. Roberts. Thank you. I'd just like to say two things. First of all, I think it's a misreading of the sale decision to focus only on the facts that happened to sale and say, okay, every applicant has to meet the same level of individualized risk. I'd like to focus the Court's attention on the Court's summary of the facts of And if you look at Hartouni, what happened to her? The Iranian government, she was an Armenian Christian in Iran. The Iranian government closed the Armenian Christian school that she was attending because they were closing Christian schools. Soldiers stoned her church while she was inside. Hartouni was approached when she was with a group of girls by Iranian soldiers because her hair wasn't covered correctly. And finally, the soldiers visited her home and asked about family members that left the United States. She wasn't touched. The level of individualized risk in Ms. Lalonde's case is much higher than the Secondly, and I don't have much time, but I'd like to address the standard of review. If you look at the Board's decision, there are basically two grounds on which the Board overturned the immigration judge's decision. One was that the Board cited the government's sort of inclination to remedy the ethnic tensions in Indonesia. Now, if in sale, by showing, you know, a period of a year of declining violence, the government can't show that conditions have changed from Indonesia, surely the Board, by citing simply the government's intention, this is just not substantial evidence. Secondly, the Board said, well, sort of mischaracterizing the immigration judge's decision, said that, you know, the mere fact that violence against Christians and Chinese or on Christians continue and women continues to occur doesn't mean that she has a well-founded fear in the absence of evidence that the Indonesian government is unwilling and unable to control the perpetrators. In this record, there's plenty of evidence that the Indonesian government is unwilling and unable to control the perpetrators, and that's all I have to say. Thank you, counsel. The case has heard and will be submitted. The next case on the oral argument calendar is Yusof v. Ashcroft. Good morning, Your Honors. May it please the Court, Robert G. Ryan for the petitioners. I'd like to reserve two minutes for rebuttal. The main issue as we see it in this case today is whether the substantial evidence in this record compels a conclusion that no reasonable adjudicator would have denied withholding a removal under the INA or the Convention Against Torture.
judges: B. Fletcher, Noonan, Thomas